**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0489n.06
Filed: July 13, 2006

**Case No. 04-2437**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| AGNES I. SWARTZ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | **ON APPEAL FROM THE** |
| v. | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE EASTERN** |
| JO ANNE B. BARNHART, | ) | **DISTRICT OF MICHIGAN** |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| _____ | ) | |

**BEFORE: KEITH and BATCHELDER, Circuit Judges; OBERDORFER\*, District Judge.**

**OBERDORFER, District Judge**. Plaintiff-appellant, Agnes I. Swartz, is a 66-year old woman with significant physical and mental impairments. The present appeal concerns her application for Social Security Disability Insurance Benefits for the period from September 1992, when she was last employed, through December 31, 1997, when her "insured status" expired.[1] An administrative law judge ruled that she was not entitled to any benefits because during that time she had the "residual functional capacity" to perform a significant number of jobs in the

---

\*The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

[1]On December 1, 2001, Swartz began receiving Supplemental Security Income disability benefits, a benefit that is not dependent on proof of "insured status."

national economy. For the reasons that follow, we conclude that the Administrative Law Judge's decision is not supported by substantial evidence. We REVERSE and REMAND for further proceedings in accordance with the following opinion.

## I. LEGAL STANDARDS

In order to qualify for Social Security Disability Insurance Benefits, Swartz must have been "disabled" during the period of her disability insurance coverage. In this context, a disability is defined as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Federal regulations establish a five-part sequential evaluation process for determining when a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). As soon as a determination of disabled or not disabled can be made, the evaluation process ends. *Id.* In order, the five steps are: (1) if the claimant is "doing substantial gainful activity," he or she is "not disabled"; (2) if the claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement," the claimant is "not disabled"; (3) if the claimant has a severe impairment and the "medical severity" of the claimant's impairment(s) "meets or equals" a listed impairment, the claimant is "disabled"; (4) if the "medical severity" does not meet or equal a listed impairment, the claimant's "residual functional capacity" is assessed and if the claimant can do his or her "past relevant work," the claimant is "not disabled"; and (5) if the claimant cannot do his or her "past relevant work," but has the residual functional capacity, taking into account the claimant's "age, education, and work experience" to "make an

2

adjustment to other work," the claimant is "not disabled." Id. "Residual functional capacity" is defined as "the most that [an individual] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545.

## II. FACTS

Agnes Swartz was born in 1940. According to her sister, Eunice Good, Swartz suffered from childhood encephalitis. As a result, Good says, Swartz has "always had difficulty with learning new skills and problem solving," "has difficulty retaining information and cannot follow through on more complex instructions," and "is easily confused and frustrated with many domestic tasks," "can do housecleaning, but cannot cook and plan a meal," "requires some level of support in her home environment," and "[o]utside of her home environment she is easily overwhelmed." AR 251.

Swartz graduated from high school, but with a very mediocre academic record. She then worked for a number of years as a nurse's aide for various employers. During her entire adulthood, Swartz never lived alone, residing with either her parents, now deceased, and/or one or more of her sisters.

In June 1992, Swartz started work as a nurse's aide at a long-term care facility. After a 90-day probationary period, she received performance evaluations from her direct supervisor and from the director of nursing at the facility, Jane Henderson. AR 405-07. Her direct supervisor rated her performance on a scale of 1 to 5 (with 1 being outstanding, 2 being very good, 3 being satisfactory, 4 being needs improvement, and 5 being unsatisfactory) as follows:

| | |
|---|---|
| Job Knowledge | 3 |
| Productivity | 4 |
| Quality | 3 |
| Relationships with Others | 5 |

| | |
|---|---|
| Dependability | 3 |
| Work Habits | 4 |
| Initiative | 4 |
| Acceptance of Supervision and Directions | 4 |

She also commented that Swartz "[n]eeds lots of improvement – needs to communicate" in her relationships to others and rated Swartz's overall performance as "needs improvement," especially Swartz's ability to communicate with families and associates and to complete tasks in a timely manner. AR 406.

Henderson's evaluation similarly stated that Swartz's work performance "need[ed] improvement," identifying the "primary areas requiring improvement" as Swartz's "ability to communicate satisfactorily with residents, families and other staff members," her "ability to complete [her] assigned responsibilities in a more timely manner," and her "limited availability for work" as a part-time employee. AR 407. Henderson recommended an additional 60-day probationary period for Swartz. Instead of consenting to an extension of her probationary period, Swartz quit. She has not worked since.

According to Swartz, she has always had problems keeping up with the work at her jobs, although she would often "work extra" to get it all done. AR 37-38. And according to Dolores Swartz, Swartz's sister-in-law and a nurse, who both knows Swartz personally and has occasionally worked with her, Swartz "tried very hard, did very good work but it was slow work." AR 43.

Between the time she ceased working and December 31, 1997, the end of the insured period, Swartz never saw a psychiatrist or sought any other form of mental health treatment. However, she did have significant contact during that time with her family physician, Dr. Michael Wagner, who subsequently offered his perspective on "some of Agnes'

4

emotional/cognitive problems" prior to December 31, 1997. In Dr. Wagner's opinion, Swartz had suffered from a number of mental health problems for her entire life. In a written statement, dated December 3, 2002, Dr. Wagner explained:

> In the office I have been treating her for nine years now, she always presented with a flat affect. She typically comes in with a relative to the appointments. When she was living with her sister Leona, she would accompany her during the examination. This is so her sister would have a handle on what advice I have given to Agnes due to the problems that Agnes has understanding what I have told her. <u>Agnes has always been slow to respond to questions</u>. She needs to think about the question before she responds. She appears to have low self-esteem. She can become easily upset.
>
> <u>From a mental/cognitive standpoint, she just appears like she is not up to speed. By analogy, if she were in school, she would probably need to be in a Special Education class</u>.
>
> . . .
>
> . . . <u>Based upon treating Agnes since 1993, the problems that I have described appear to be something that she has had all her life</u>.

AR 408 (emphasis added).

In July 2001, Dr. George Pestrue, from the Michigan Disability Determination Service, began his evaluation of Swartz's mental health. Based on a face-to-face evaluation and other testing information, Dr. Pestrue preliminarily concluded that Swartz "appeared to have significant cognitive deficits." AR 243-250. Dr. Pestrue then conducted further face-to-face testing, testing her IQ at 72, her reading level at 5th grade, her spelling ability at 6th grade, her math skills at 4th grade and her overall mental age at 11 years, 9 months. Describing "her combined cognitive/verbal and visual-motor skills" as "in the borderline defective range, he diagnosed Swartz as having "Borderline Intellectual Functioning." AR 267-28. After further face-to-face testing, Dr. Pestrue concluded that Swartz's "memory skills varied from the

5

defective range to the normal range," with "most of her combined memory skills" falling "in the borderline range." AR 284-86. As a result, he added "Borderline Memory Functioning" and "Dependent Personality Disorder" to his diagnosis of Swartz's conditions. In summary, Dr. Pestrue explained his diagnoses as follows:

> This examiner has seen this client on three occasions. He saw her for a complete mental status examination on 25 July 2001, for intelligence testing on 12 September 2001 and for this memory examination. It has become apparent that she is suffering from a severe dependent personality disorder which was not noted by this examiner in previous reports. It has become more apparent recently because her sister with whom she has been living is getting married and will leave the home. This means that the client will be left alone in the home. This is causing her a great amount of stress. She is uncertain how she will exist without her sister to rely on. This diagnoses is now being included along with the previous diagnoses of major depression and borderline intellectual functioning. All of these problems appear to be long standing. All of them have been present since her childhood.

*Id*. (emphasis added).

In November 2002, Dr. Pestrue completed a Mental Residual Functional Capacity Assessment of Swartz. AR 409-410 (Nov. 25, 2002). He assessed her as "markedly limited" in her "ability to understand and remember detailed instructions," her "ability to carry out detailed instructions," her "ability to maintain attention and concentration for extended periods," her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," her "ability to interact appropriately with the general public," her "ability to ask simple questions or request assistance," her "ability to set realistic goals or make plans independently of others,"and her "ability to accept instructions and respond appropriately to criticism from supervisors." AR 409-10. He assessed her as "moderately limited" in her "ability to remember locations and work-like procedures," her "ability to sustain an ordinary routine without supervision," her "ability to make simple work-related decisions," her "ability to

6

respond appropriately to change in the work setting," and her "ability to be aware of normal hazards and take appropriate precautions. *Id.* Finally, he assessed her as "not significantly limited" in her "ability to carry out simple, one or two-step instructions," and in her "ability to work in coordination with or proximity to others without being distracted by them." *Id.*

## III. PROCEDURAL HISTORY

Swartz had Social Security Disability Insurance coverage from the time she ceased working in 1992 until December 31, 1997. She has filed two applications seeking benefits under that coverage. Her first application, filed on November 8, 1994 (the "1994 application"), was denied on January 4, 1995. Swartz, who was not represented by counsel at the time, did not appeal. She filed a second application on April 17, 2001 (the "2001 application"), claiming that she was disabled from September 1992 through December 31,1997 due to certain mental disabilities."[2] Because the denial of the 1994 application barred her from recovering benefits for the earlier part of the insured period, Swartz also sought to reopen her 1994 application.

On December 3, 2002, an Administrative Law Judge held a hearing at which Swartz testified and presented other evidence in support of her application. In addition to the evidence previously described, the record includes the opinions of two non-treating physicians, Dr. Arthur Dundon and Dr. Robert L. Newhouse, each of whom reviewed Swartz's file and completed a Psychiatric Review and a Mental Residual Functional Capacity Assessment, and the testimony of a vocational expert.

_____

[2]Swartz also claimed to have been disabled by physical health problems and depression. However, the ALJ concluded that neither rendered Swartz disabled prior to December 31, 1997, and Swartz did not appeal that aspect of the ALJ's decision.

7

Dr. Dundon reviewed Swartz's file and prepared his reports in August and October of 2001. He concluded that Swartz suffered from "borderline intellectual functioning," a "medically determinable impairment," but not an impairment that satisfied the diagnostic criteria for an "Organic Mental Disorder." AR 253-266. In his Psychiatric Review, on a scale of none to extreme, he rated as "moderate" Swartz's "degree of limitation" for "difficulties in maintaining social functioning" and for "difficulties in maintaining concentration, persistence, or pace." *Id*. In his Mental Residual Functional Capacity Assessment, he rated Swartz as "moderately limited" in "the ability to understand and remember very short and simple instructions," "the ability to carry out detailed instructions," the ability to sustain an ordinary routine without special supervision," "the ability to interact appropriately with the general public," and "the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," but markedly limited in nothing. AR 269-72. He found that Swartz "could not understand/remember/carry out complex technical instructions on a sustained basis," "would have some problems maintaining attention and concentration on a sustained basis," and "would not work well in large groups or with public," but his ultimate conclusion was that Swartz "could adapt," and "retains ability to do simple tasks on a sustained basis." *Id.*

Dr. Newhouse completed his "Psychiatric Review" and "Mental Residual Functional Capacity Assessment" in March 2002. He diagnosed Swartz as suffering from an "Organic Mental Disorder," a "listed" impairment, AR 385, and a "Personality Disorder," another "listed" impairment, AR 391. In his opinion, Swartz had a "marked" degree of limitation in "Restrictions of Activities of Daily Living," and a "moderate" degree of limitation in "Difficulties in Maintaining Social Functioning" and "Difficulties in Maintaining Concentration,

8

Persistence, or Pace." AR 394. He also found her "markedly limited" in her "ability to maintain attention and concentration for extended periods," and her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and "moderately limited" in her "ability to understand and remember detailed instructions," her "ability to carry out detailed instructions," her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and her "ability to work in coordination or proximity to others without being distracted by them." AR 398-99.

The vocational expert, Judith Findora, testified that an hypothetical individual "with the same age and educational background" as Swartz and with "non-exertional limitations of no acute vision required, no complex tasks, define that as one and two step only, simple, rote tasks," "[n]o hourly quotas, as in [an] assembly line type job," and "[n]o dealing with the general public, minimal work activity interaction with coworkers, minimal supervision" would not be able to do Swartz's past work as a nurse's aide, but that there would be jobs in the region compatible with these limitations, including in the medium exertion category the job of janitor and in the light exertion category the job of housekeeper. However, she testified, if that same hypothetical individual also had either "[n]o useful ability to complete a normal work load within the prescribed daily schedule," "[n]o ability to deal with supervision," an "inability to follow directions," "an inability to relate to coworkers or supervisors, problems that would arise at the work place," or was unable to "meet acceptable productivity," that individual would not be able to obtain "competitive employment." AR 53-57.

9

On February 12, 2003, the administrative law judge issued a written opinion denying Swartz's 2001 application. Applying the five-step test, the ALJ concluded (1) that Swartz was not performing substantial gainful work; (2) that Swartz had a severe impairment of "organic mental disorder"; (3) that Swartz would not be presumed disabled because her "organic mental disorder" did not meet or equal a listed impairment; (4) that Swartz's impairments would have prevented her from doing her past relevant work (as a nurse's aide); but (5) that Swartz retained the residual functional capacity to perform a significant number of jobs in the national economy. Specifically, the ALJ concluded that Swartz, during the insured period:

> retained the residual functional capacity to perform work that did not require acute vision, complex tasks involving more than 1 or 2 step tasks, hourly quotas in assembly line type work, dealing with the general public, more than minimal supervision, and more than minimal work interaction with co-workers

AR 22. Taking into consideration Swartz's age, education, and past relevant work experience, the ALJ then concluded that even though Swartz could not perform her past relevant work as a nurse's aide and "ha[d] no transferable skills," there were a "significant number of jobs in the national economy that she could perform," such as work as a janitor or housekeeper. Accordingly, the ALJ concluded, Swartz was "not disabled" during the relevant time period and not entitled to benefits. AR 21, 23.

The ALJ also ruled that Swartz was not entitled to have her earlier case reopened because:

> [she] was able to pursue an appeal but failed to do so. Her new application was not filed until April 17, 2001, which is more than 4 years after the date of the prior unfavorable decision. Thus, the prior decision is beyond the period during which it could be reopened for good cause, such as new and material evidence. There is no exception in this case to allow reopening after 4 years.

AR 15.

10

Swartz timely sought review of the ALJ's decision by the Appeals Council for the Social Security Administration on the ground that "the decision is against the weight of the evidence." On April 14, 2003, the Appeals Council summarily denied Swartz's request for review, rendering the ALJ's decision the "final decision of the Commissioner of Social Security" in the case. AR 6.

On July 1, 2003, Swartz filed a complaint in federal district court against the Commissioner of Social Security, challenging the Social Security Administration's denial of her 2001 application for disability insurance benefits and refusal to reopen her 1994 application. The Commissioner filed a motion for summary judgment; Swartz filed a motion to remand for reconsideration. The district court referred both motions to a magistrate for a report and recommendation. On June 21, 2004, the magistrate recommended that the district court deny Swartz's motion to remand and grant the Commissioner's motion for summary judgment. Overruling Swartz's objections, the district court adopted the magistrate's report and recommendation. Swartz then filed the present appeal.

## II.  DISCUSSION

On appeal, Swartz challenges the ALJ's conclusion that she was not disabled during the relevant time period and his refusal to reopen her 1994 application.

### A.      Standard of Review

The court applies a substantial evidence standard in reviewing the administrative denial of Social Security disability benefits. *See Cutlip v. Secretary of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994). "Substantial evidence is that which is greater than a scintilla but less than a preponderance. In essence, substantial evidence is 'such relevant evidence as a

11

reasonable mind might accept as adequate to support a conclusion.'" *Walker v. Secretary of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir.1992) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

**B.      ALJ's Ruling that Swartz was "Not Disabled"**

Swartz argues that the ALJ's ruling that she was not disabled before December 31, 1997 is not supported by substantial evidence because: (1) in determining whether Swartz suffered from any severe impairments (step two of the analysis), the ALJ erroneously identified Swartz's only severe impairment as "Organic Mental Disorder," instead of also including her "Borderline Intellectual Functioning" and "Dependent Personality Disorder"; and (2) in assessing Swartz's "residual functional capacity" (step five of the analysis), the ALJ ignored Swartz's 1992 negative work performance evaluation, mistakenly believing that it had been completed post-1997, and otherwise failed to account for evidence that she would have been unable to keep up with the pace at any job, not merely a job with hourly quotas.

Even assuming that the ALJ erred by not including "Borderline Intellectual Functioning" and "Dependent Personality Disorder" as additional severe impairments in step two of its analysis, the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her  residual functional capacity. *See Maziarz v. Secretary of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  Thus, the critical issue on appeal is simply whether substantial evidence supports the ALJ's conclusion that Swartz, during the insured period, retained the residual functional capacity to perform 1-2 step jobs not involving interaction with

12

the public, more than minimal supervision, more than minimal interaction with co-workers, or

hourly quotas.

In determining Swartz's "residual functional capacity," the ALJ analyzed the evidence as

follows:

> The claimant testified that she was unable to work during the period at issue due
> to . . . and other mental problems. However, the medical reports and other
> evidence fail to demonstrate disabling . . . mental problems on or before the date
> last insured of December 31, 1997.
>
> . . .
>
> . . . On December 4, 1997, the only complaint [in a visit to her primary treating
> physician, Dr. Wagner] was of sinus problems. Thus, at a treatment visit shortly
> before the date last insured of December 31, 1997, the claimant was not reporting
> any . . . mental problems.
>
> . . .
>
> The evidence of record also demonstrates that the claimant did not report severe
> mental problems until 2001, well after the date last insured. The claimant
> underwent a psychological evaluation at the expense of the Social Security
> Administration on July 25, 2001. This is the first time she was diagnosed to have
> major depression. . . .
>
> . . . Regarding other mental problems, IQ testing on September 12, 2001 showed
> a verbal IQ of 73, a performance IQ of 76, and a full scale IQ of 72. These scores
> are indicative of intelligence in the borderline range. Memory testing . . . in
> January 2002 showed the claimant's memory was also in the range of borderline
> impairment. Dr. Wagner stated in a report dated December 3, 2002, that he has
> treated the claimant for 9 years and has noticed indications of mental slowness
> during that time. There is, however, no IQ testing or evidence showing a
> diagnosis of an organic mental disorder prior to the recent testing. The claimant
> was able to obtain a high school degree and was not in special education. She
> was able to work at a semi-skilled job as a nurse's aide for many years.
>
> Dr. Wagner also stated that, during the 9 years he has treated the claimant, she has
> been able to handle performing normal daily activities. . . .
>
> Opinions of record concerning the claimant's capacity to work have been
> considered in making this determination . . . . This includes consideration of

opinions from non-examining sources from the State Agency, who reviewed the evidence in connection with prior decisions on this case. No medical opinion can be given controlling weight unless it is supported by the medical evidence and consistent with other evidence of record.

. . . .

Regarding her mental capacity, Jane Henderson, RN submitted a report that the claimant has significant work-related limitations, including a slow pace and poor communication skills. However, this report is based on observations for the period of May 11, 1992 through September 1, 1992. Thus, it pertains to a period well after the date last insured and after the claimant's severe depression began in 2001. Therefore, this opinion is not entitled to significant weight regarding an assessment of the claimant's condition on or before December 31, 1997.

A treating physician, Dr. Pestrue, submitted a mental residual functional capacity assessment indicating that the claimant has marked limitations on her ability to work. However, the report was completed in November 2002 and is based on treatment dating back only to September 2001. Again, such an opinion cannot be given significant weight regarding the period on or before the date last insured of December 31, 1997.

A psychiatrist from the State Agency [Dr. Dundon] reviewed the evidence of record from October 2001 and found the claimant able to do simple job tasks. . . . It was only on March 15, 2002, when [the more recent psychological] records were in the file that a psychiatrist from the State Agency [Dr. Newhouse] found the claimant unable to perform even simple job tasks. The undersigned is in agreement with the State Agency psychiatrists in finding the claimant able to perform simple job tasks, prior to the beginning of her severe depression in 2001.

. . . All of the evidence regarding mental conditions dates from 3 to 4 years after the date last insured

AR 17-20 (emphasis added).

The ALJ's analysis includes one clear (and conceded) error: he dismissed as irrelevant Swartz's negative work performance evaluations from September 1992 on the ground that they were completed "well after the date last insured and after the claimant's severe depression began in 2001." Swartz contends that the 1992 work performance evaluations are significant because they corroborate the more recent opinions of her treating physicians, Dr. Pestrue and Dr.

14

Wagner, and one of the non-treating physicians, Dr. Newhouse, that notwithstanding more recent mental health issues, *e.g.* depression, she has suffered from other disabling mental health problems her entire life.  Thus, Swartz argues, substantial evidence does not support the ALJ's determination that during the insured period she had the residual functional capacity to perform simple one to two step jobs as long as there were no hourly quotas; rather, the evidence shows that she would have had difficulty keeping up with the work pace at any job.

Although the "substantial evidence" test is not overly demanding, we conclude that substantial evidence does not support the ALJ's finding that Swartz retained the residual functional capacity to perform simple one to two step jobs as long as there were no hourly quotas.  The ALJ's analysis reflects one clear error – the ALJ's belief that the 1992 evaluations dated from after the insured period – and fails to explain why no weight is given to the several medical opinions that Swartz's problems are life-long conditions.  In essence, the ALJ accepts the opinion of one non-treating physician (Dr. Dundon) over the opinions of two treating physicians (one of whom had Swartz as a patient during the insured period, Dr. Wagner, and one of whom treated her mental health issues, Dr. Pestrue) and one other non-treating physician (Dr. Newhouse).  The ALJ discounted Dr. Pestrue's opinion because he only began treating Swartz in 2001, and he discounted Dr. Newhouse's opinion because he reviewed Swartz's file only after Dr. Pestrue's diagnoses had been added to it, but he never acknowledges Dr. Pestrue's opinion that all of the conditions he identified were likely to have been life-long problems.  The ALJ's analysis also relies in part on the fact that Swartz did not seek any mental health help when she visited Dr. Wagner in December 1997, without explaining why she would have sought such help

from her family physician. The ALJ's analysis also completely ignores Dr. Wagner's, Swartz's sister's and Swartz's sister-in-law's shared opinion that Swartz has always been slow.

Without deciding whether Swartz would have had difficulty keeping up with the work pace at any job, as she contends, we hold that the ALJ's assessment of Swartz's residual functional capacity is not supported by substantial evidence because it ignores, without any persuasive justification, all of the evidence in the record that Swartz's organic mental disorder, borderline intellectual functioning, and severe personality disorder were lifelong conditions, arguably requiring a greater pace limitation in Swartz's residual functional capacity. We will remand in order to permit the ALJ in the first instance to decide whether an error-free assessment of the evidence alters his residual functional capacity assessment and, if so, to reassess whether with that additional limitation Swartz would have been able to perform any job during the insured period.

## C.    Denial of Motion to Reopen

Swartz contends that the ALJ erred in refusing to reopen her 1994 application. Generally, federal courts lack jurisdiction to review an administrative decision not to reopen a previous claim for benefits. *See Califano v. Sanders*, 430 U.S. 99, 107-09 (1977). The only exception to this rule is "where the Secretary's denial of a petition to reopen is challenged on constitutional grounds." *Id.* at 109. Here, Swartz raises a constitutional issue, contending that the denial of her motion to reopen her 1994 application deprives her of due process because at the time her 1994 application was denied, in 1995, her mental disabilities prevented her from understanding and pursuing her administrative remedies. Accordingly, this court has jurisdiction to consider whether the ALJ properly denied Swartz's motion to reopen.

16

The ALJ denied the motion to reopen on the ground that it was out of time and that "the medical reports and other evidence fail to demonstrate . . . mental problems on or before the date last insured of December 31, 1997" that rendered Swartz unable to file a timely appeal. The question on appeal is whether the ALJ's finding that Swartz had the capacity to file a timely appeal is supported by substantial evidence. Again, the ALJ's error in ignoring the 1992 work evaluations coupled with the failure to account for the medical opinions that many of Swartz's mental problems were lifelong conditions lead us to conclude that the finding is not supported by substantial evidence and that a remand for further consideration is required. Thus, we will remand in order to permit the ALJ in the first instance to decide whether an error-free assessment of the evidence supports reopening. If the ALJ so concludes, then the fact that Swartz did not seek this relief within four years of the initial denial will not matter. *See* Social Security Rule 95-1 (a request to extend the time for seeking review will be granted where the claimant has "establishe[d] that he or she lacked the mental capacity to understand the procedures for requesting review.")

### III. CONCLUSION

For the reasons stated in the foregoing opinion, the decision of the district court granting summary judgment to the defendant-appellee and denying the plaintiff-appellant's motion to remand is REVERSED, and this matter is REMANDED to the district court with instructions to remand to the Social Security Administration to reconsider its denial of Swartz's 2001 application for benefits and motion to reopen her 1994 application for benefits.